UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 24 Cr. |
| ANTHONY SACCAVINO and BRIAN CORDASCO, | |
| Defendants. | 24 CRIM 537 |

### Overview

1.    ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, repeatedly abused their positions of trust as high-ranking officials in the New York City Fire Department (the "FDNY") from at least in or about 2021 through in or about 2023 by soliciting and accepting tens of thousands of dollars in bribe payments in exchange for providing preferential treatment to certain individuals and companies with matters pending before the FDNY.

2.    During the relevant period, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, were Chiefs of the FDNY's Bureau of Fire Prevention (the "BFP" or "Fire Prevention"). The BFP is the FDNY division that regulates the installation of fire safety and suppression systems in commercial and residential buildings throughout New York City. The BFP ensures that these systems comply with fire safety regulations by, among other things, reviewing and approving design plans and conducting on-site inspections of installed systems. In many cases, BFP approvals are required before a building can be occupied or opened to the public. As Chiefs of Fire Prevention—and, ultimately, the top two ranking members of the BFP—during the relevant period, SACCAVINO and CORDASCO supervised the BFP personnel who conducted these plan reviews and inspections. For nearly two years, SACCAVINO and CORDASCO misused this authority for their own financial gain.

3. Specifically, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, solicited and accepted bribes from a retired FDNY firefighter ("CC-1") who ran a so-called "expediting" business (the "CC-1 Company"). Acting in large part at the direction of SACCAVINO and CORDASCO, CC-1 promised his customers that he could "expedite"—or fast-track—their plan reviews and inspection dates with the BFP, in exchange for payment. CC-1 made this claim even though the BFP generally addressed applications on a first-come, first-served basis, and notwithstanding the significant wait times that BFP applicants generally faced during the relevant period.

4. Behind the scenes, after a customer had hired the CC-1 Company, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, directed BFP personnel to prioritize that customer's plan review or inspection request in order to get paid by CC-1. SACCAVINO and CORDASCO justified these priority requests within the FDNY by lying to their BFP subordinates or relying on their influence as BFP Chiefs. CC-1 was paid by the customers of his company for this so-called "expediting" and, in turn, CC-1 made bribe payments to SACCAVINO and CORDASCO to obtain preferential treatment by the BFP for his customers.

5. Collectively, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, and CC-1 received more than $190,000 in bribe payments in connection with this scheme.

6. In or about February 2024, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, were each voluntarily interviewed by the Federal Bureau of Investigation ("FBI"). During those interviews, SACCAVINO and CORDASCO each repeatedly made false statements in an effort to conceal their involvement in the bribery scheme.

2

## Relevant Individuals and Companies

### *Anthony Saccavino and His Wife's Company*

7.     ANTHONY SACCAVINO, the defendant, joined the FDNY in or about 1995. From that time until in or about 2020, SACCAVINO served as a uniformed firefighter and, later, a Battalion Chief.   In or about May 2020, about 24 years into his tenure with the FDNY, SACCAVINO began a tour of duty at the BFP.   Approximately six months later, on or about October 1, 2020, he was promoted to the rank of Deputy Chief in the FDNY and formally appointed as one of the three Staff Chiefs in the Bureau of Fire Prevention.   Between in or about January 2021 and in or about February 2023, SACCAVINO rose to the rank of Deputy Assistant Chief in the FDNY while continuing to be one of the Staff Chiefs in charge of the BFP.   In his role at the BFP, SACCAVINO oversaw the BFP personnel with primary responsibility for inspecting fire safety and suppression systems to ensure their compliance with fire safety regulations.   In or about February 2023, SACCAVINO was promoted to the rank of Assistant Chief in the FDNY and Chief of the BFP, making him the highest-ranking member of the BFP. This promotion made SACCAVINO ultimately responsible for all of the operations of the BFP, including both inspections and plan reviews.   As Chief of the BFP, SACCAVINO was paid an annual salary of approximately $263,478.

8.     ANTHONY SACCAVINO, the defendant, has at all relevant times been married to the same spouse ("Saccavino's Wife").   Also at all relevant times, Saccavino's Wife has owned and operated a New York-registered company (the "Saccavino Wife Company").   In or about December 2021, Saccavino's Wife opened a business bank account for her company (the "Saccavino Wife Company Bank Account").

### *Brian Cordasco and His Company*

9.      BRIAN CORDASCO, the defendant, joined the FDNY in or about 2002.  From that time until in or about 2020, CORDASCO served as a uniformed firefighter and, later, a Battalion Chief.  In or about November 2020, CORDASCO began working a detail at the BFP, where he oversaw the BFP's Office of Technology Management before being formally promoted to the rank of Deputy Chief in the FDNY with responsibility for the Office of Technology Management in or about April 2021.  About two years later, in or about February 2023, CORDASCO was promoted to Deputy Assistant Chief in the FDNY and was made one of the Staff Chiefs of the BFP, making him the second-in-command to ANTHONY SACCAVINO, the defendant, who was newly promoted to the Chief of the BFP around the same time.  In each of these roles, CORDASCO oversaw the BFP personnel responsible for reviewing and approving design plans for fire safety and suppression systems, to ensure their compliance with fire safety regulations.  As a Deputy Assistant Chief in the FDNY, CORDASCO was paid an annual salary of approximately $257,296.

10.     In or about February 2022, BRIAN CORDASCO, the defendant, formed a New York-registered company (the "Cordasco Company").  Around the same time, CORDASCO opened a business bank account for the Cordasco Company (the "Cordasco Company Bank Account").

### *CC-1 and His Company*

11.     CC-1 was an FDNY firefighter for approximately 20 years.  He retired from the FDNY in or about December 2019.  During his time in the FDNY, CC-1 knew both ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants.  CC-1 worked directly with SACCAVINO and built a close personal friendship with him that continued after CC-1's

4

retirement from the FDNY.   CC-1 attended the FDNY's Fire Cadet Academy with CORDASCO and maintained a casual relationship with him thereafter.   As a member of the FDNY, CC-1 never worked at the BFP and had no personal experience with technical and administrative requirements of BFP plan reviews and inspections, or the process for drafting and submitting applications with the BFP.

12.      Shortly after CC-1's retirement from the FDNY in late 2019, CC-1 formed the CC-1 Company in New York.   About a week after forming his company, CC-1 opened a business bank account in the company's name (the "CC-1 Company Bank Account").

### BFP Plan Reviews and Inspections

#### *Background on the BFP*

13.      The BFP is the FDNY division responsible for regulating the installation of fire safety and suppression systems throughout New York City and for ensuring general compliance with existing fire safety regulations.   The systems that the BFP regulates include, for example, fire alarm systems in commercial and residential buildings and rangehood fire suppression systems in commercial kitchens.   A fire alarm system is designed to protect the occupants of a building by detecting smoke, fire, or carbon monoxide incidents; alerting building occupants to those incidents; and dispatching the FDNY.   Similarly, a rangehood fire suppression system is designed to protect the cooking equipment within a commercial kitchen in the event of a fire and is critical to the overall safety of any restaurant.   When required, both systems must be approved and inspected by the BFP before a building or restaurant can legally operate.

14.      The BFP is staffed primarily by hundreds of non-firefighter, civilian employees of the FDNY, such as plan examiners who review and approve design plans and inspectors who conduct on-site inspections and testing.   However, the BFP is generally overseen by career

firefighters—like ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants—who typically serve as the Chiefs of Fire Prevention.

15.     The BFP's employees each are assigned to either one of approximately ten District Offices or one of several specialized units.    The District Offices, which are located across the five boroughs of New York City, are responsible for deploying fire protection inspectors to ensure general compliance with the New York City Fire Code, a law that establishes fire safety requirements for buildings and businesses in New York City.    The specialized units, on the other hand, are located mostly within FDNY's headquarters in Brooklyn and are specifically responsible for, among other things, conducting design plan reviews and approvals, as well as on-site inspections and testing, of fire safety and suppression systems.

16.     From at least the time that BRIAN CORDASCO, the defendant, began working a detail in the BFP in or about November 2020, and continuing through at least in or about September 2022, the BFP's specialized units included, among others: (1) the Office of Technology Management, which was generally responsible for BFP design plan reviews and approvals, and included a dedicated sub-unit for fire alarm plan reviews, known as the Fire Alarm Plan Examination Unit; and (2) a series of inspection units, each responsible for inspecting a different type of fire safety or suppression system, including the Fire Alarms Inspection Unit and the Rangehood Inspections Unit.    During this period, CORDASCO oversaw the Office of Technology Management, such that he had supervisory authority over plan reviews conducted by the BFP.    Also during this period, ANTHONY SACCAVINO, the defendant, had supervisory authority over the inspections units, including the Fire Alarm Inspections Unit and the Rangehood Inspections Unit.    This organizational structure, which divided the responsibility for plan reviews and inspections across different units, each with different Chiefs overseeing those units, was put

6

in place to help ensure the integrity of the BFP process.   In other words, it made the BFP's review and approval process more robust by ensuring that no single chain of command would have responsibility for determining that a particular fire safety or suppression system was compliant and safe.

17.      In or about at least September 2022, however, the responsibility for conducting plan reviews and inspections of fire alarm systems—which had previously been divided across separate units, under separate Staff Chiefs—was consolidated into a single unit later renamed the Plan Review and Fire Alarms Inspection Unit.   This change in the BFP's organizational structure was made in part to address long delays in plan reviews and inspections of fire alarm systems, which arose out of staffing shortages and general slowdowns resulting from the COVID-19 pandemic. At the same time, this change, which was brought about in part by ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, also worked to further the goals of the charged bribery conspiracy.   In particular, SACCAVINO and CORDASCO helped install a trusted BFP employee as the Executive Director (the "Executive Director") of the newly consolidated fire alarm unit.   In that role, the Executive Director reported to SACCAVINO and, then later, both SACCAVINO and CORDASCO.   As described below, during the relevant period, SACCAVINO and CORDASCO repeatedly directed the Executive Director to arrange for expedited plan reviews and inspections for fire alarm systems for CC-1's customers.

### *The BFP Review Process*

18.      In the ordinary course, design plans submitted to the BFP during the relevant period were reviewed on a first-come, first-served basis, meaning that earlier-filed plans were reviewed before later-filed plans.   This rule generally applied to new plans and to revised or amended plans, subject to limited exceptions not applicable here.   Inspections were also generally scheduled in

7

the order that they were requested. This first-come, first-served policy helped to ensure the fairness and public accessibility of the BFP's plan review and inspection process.

19. From in or about 2020 through at least in or about 2022, the wait times for plan reviews and inspection dates in certain BFP units were unusually long. These backlogs arose due to staffing shortages and slowdowns caused by the COVID-19 pandemic, and were particularly severe for plan reviews of fire alarm systems and rangehood fire suppression systems, and for the inspection of fire alarm systems. For example, in or about April 2022, the wait times were approximately: (a) 13 to 16 weeks for a fire alarm system plan review, (b) 8 to 9 weeks for a rangehood plan review, and (b) 8 weeks for a fire alarm system inspection.

20. Faced with these backlogs, and the BFP's first-come, first-served policy, applicants for BFP plan reviews and inspections in the relevant period were particularly incentivized to ensure that their applications met the BFP's technical and administrative requirements and to respond thoroughly and promptly to any follow-ups from the BFP. To assist in that process, owners, developers, and other applicants often hired a registered "Expediter," otherwise known as a "Filing Representative."

21. Filing Representatives are companies or individuals authorized by the FDNY to represent third party applicants in matters before the BFP and to submit, file, request, negotiate or otherwise seek the approval of applications on their behalf. They help their clients navigate the complicated BFP application and approval process. For example, Filing Representatives submit design plans in compliance with BFP requirements and applicable fire safety regulations, respond to technical follow-up questions raised by the BFP, and seek preferred inspection dates from the BFP, if available. In this way, Filing Representatives could help their clients avoid unnecessary delays in the processing of their BFP requests, a service often referred to in the industry as

8

"expediting." Filing Representatives, however, could not circumvent the BFP's first-come, first-served policy or otherwise cause their clients' plan review and inspection requests to be addressed more quickly than the general public, subject to limited exceptions not applicable here.

22.    In addition, Filing Representatives have at all relevant times been prohibited by FDNY policy from giving anything of value to BFP personnel in exchange for preferential treatment for their clients.  As set forth in the FDNY Expediter Mandatory Instructions and Terms and Conditions, registered Filing Representatives have at all relevant times been required to acknowledge that "it is unlawful to . . . give to a city employee, or for a city employee to accept, any benefit, monetary or otherwise, either as a gratuity for properly performing the job or in exchange for special consideration.  Such actions are punishable by imprisonment, fine and/or loss of license."

### *The City Hall List*

23.    Although Filing Representatives and other applicants working during the relevant period generally had their BFP requests processed in the order they were received, certain City Hall officials would at times ask the BFP to give priority treatment to certain projects, and the BFP then often prioritized those requests.

24.    Specifically, for a period including at least in or about 2021 through in or about 2022, representatives of the FDNY's Office of Legislative and Intergovernmental Affairs (the "IGA") maintained a list of projects with plan reviews or inspections pending before the BFP. This list was used to track inquiries and requests from City Hall stakeholders external to the IGA—such as the Deputy Mayor's Office, or the "DMO"—so that the FDNY and its leadership in the Fire Commissioner's Office could prioritize requests that were deemed important by those City Hall officials.  As a result, the list was referred to by members of the FDNY (including the BFP) and others in City government as the "DMO List" or the "City Hall List" (hereinafter, the "City

Hall List"). The fact that certain projects appeared on the City Hall List was periodically communicated to BFP personnel—either by the IGA, the Fire Commissioner's Office, or others within the FDNY or City Hall—with a request that the BFP give priority to those projects. The projects on the City Hall List ranged from schools and hospitals to a movie theater, restaurants, and a luxury gym. As requested by City Hall officials, the BFP in fact gave priority to certain projects appearing on the City Hall List.

25.    During the relevant period, BRIAN CORDASCO, the defendant, both within the FDNY and to the public, purported to be an opponent of attempts to prioritize special projects, including those appearing on the City Hall List. For example, on or about April 7, 2022, CORDASCO sent an internal FDNY email complaining that attempts by the Mayor's Office to expedite a major midtown development project were "extremely unfair to the applicants who have been waiting at least 8 weeks for their inspection. Industry opposition will include questions as to why certain projects are advanced while others need to be canceled and pushed back?" This email was later published and discussed in the news media. In response to the media reporting, CORDASCO repeated his complaints in messages he exchanged with friends, including by writing in part that: "[I]t's true, council people requesting stuff all the time, and we have emails asking city hall to prioritize for us…and they did. It highlights the lack of staffing too, which we have been saying for 3yrs. There is no support for Fire Prevention, but elected's [sic] want what they want, when they want it. . . ." As detailed herein, despite claiming to be an opponent of the BFP giving select projects preferential treatment, CORDASCO did just that in exchange for tens of thousands of dollars in bribes.

## The Defendants' Schemes

### *SACCAVINO, CORDASCO, and CC-1 Become Secret Partners*

26.     Beginning as early as in or about 2020, ANTHONY SACCAVINO, the defendant, and CC-1 had a series of conversations about partnering in a business providing certain fire safety-related services to commercial and residential building owners in New York City.   By in or about the summer of 2021, SACCAVINO and CC-1 had agreed that CC-1 would own and operate a fire-safety business with SACCAVINO as a secret partner who would help the business thrive in exchange for a share of the profits. CC-1 operated this business through a pre-existing company owned by CC-1—the CC-1 Company—which CC-1 had previously operated as a hospitality and nightlife business.   Later, in or about July or August 2021, BRIAN CORDASCO, the defendant, joined as a second partner in the business with CC-1 and SACCAVINO.   From in or about 2021 through in or about 2023, as part of their secret partnership with CC-1, CC-1 paid SACCAVINO more than $100,000 and paid CORDASCO more than $90,000.

27.     At the time they agreed to secretly partner with CC-1, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, were active FDNY Chiefs staffed at the BFP.   Because of their roles in the BFP, including because of conflict-of-interest rules, SACCAVINO and CORDASCO could not have openly operated a business providing fire safety-related services that fell under the purview of the BFP without raising serious ethical and legal concerns.   Notably, and likely due to avoid such concerns being raised, CC-1 was the public face of the CC-1 Company, while SACCAVINO and CORDASCO secretly took actions within their roles at the FDNY to assist the CC-1 Company's customers.

### *The Pay-to-Play Expediting Scheme*

28.     At the suggestion of ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, one of the fire safety-related services that the CC-1 Company began to offer in or about

11

July 2021 was "expediting" services to customers with matters pending before the BFP. This scheme generally operated as follows.

29.     CC-1 explained to potential customers that, for a cost, he could obtain faster plan reviews and earlier inspection dates from the BFP than were otherwise being offered to the public. If asked how he was able to do this, CC-1 referred generally to the fact that he had relationships or connections in the FDNY as a result of his time as a firefighter. CC-1 did not disclose, however, that he was working in partnership with or compensating ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, in exchange for actions they took to assist the CC-1 Company's customers.

30.     CC-1's potential customers were typically Filing Representatives who had themselves been hired by building owners, developers, or their agents to handle design plans and inspection requests filed with the BFP. Given the significant backlogs plaguing the BFP's review and inspection process at that time, these Filing Representatives were often willing to pay CC-1 and his company thousands of dollars to obtain the "expediting" services he offered. CC-1 had secretly promised to provide SACCAVINO and CORDASCO each approximately 30 percent of every payment that a customer made to the CC-1 Company for "expediting" services.

31.     At times, CC-1 identified potential customers on his own, based on his pre-existing business connections or leads that he generated himself. At other times, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, identified potential clients in the course of their official duties and steered them to CC-1 and his company. For example, in or about October 2022, CORDASCO directed a particular Filing Representative ("Filing Representative-1") who had sought CORDASCO's assistance, in CORDASCO's official capacity, with certain pending BFP matters to contact CC-1 instead. Filing Representative-1 ultimately hired and paid

12

the CC-1 Company more than $50,000 to provide "expediting" services in connection with at least eight different projects.

32.     After hiring the CC-1 Company to "expedite" their plans reviews and inspections, Filing Representatives provided CC-1 identifying information about the matters they had pending before the BFP, such as plan numbers, physical addresses, and pre-scheduled inspection dates. CC-1 relayed this information to ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, typically using a group chat (the "Group Chat").

33.     ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, used the customer identifying information provided to them by CC-1 to identify the responsible BFP personnel and cause them to expedite the customers' BFP requests.  These personnel included plan examiners and inspectors who were responsible for reviewing and approving design plans, and conducting inspections, of fire alarm systems and rangehood fire suppression systems. SACCAVINO and CORDASCO collectively supervised these BFP personnel.

34.     CC-1 charged his customers thousands of dollars for each expedited plan review and priority inspection date that they received from the BFP.  CC-1 at times sent invoices to his customers for this work, which typically identified the project, whether a plan review or an inspection had been expedited, and the amount charged.  After the CC-1 Company received payment from its customers, CC-1 made bribe payments to ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants.  These payments were made in the form of cash, check, and electronic transfers through applications like Zelle.  Most of these payments were in the form of checks from the CC-1 Company to the Saccavino Wife Company (for SACCAVINO) and the Cordasco Company (for CORDASCO).  At times, CC-1 personally delivered these cash and check payments to SACCAVINO and CORDASCO, including during meetings at the BFP

13

headquarters in Brooklyn and during steakhouse dinners in Manhattan. Over the life of the scheme, SACCAVINO, CORDASCO, and CC-1, collectively, were paid a total of over $190,000 in exchange for "expediting" services provided for the benefit of CC-1's customers.

35.    Although CC-1 purported to be engaged in a so-called "expediting" business, CC-1 has never been registered with the FDNY as a Filing Representative or "Expediter." As such, he was not authorized by the FDNY to represent third-party applicants in matters pending before the BFP. Nor did CC-1 perform the functions of a Filing Representative. Even if CC-1 had been registered or acting as a Filing Representative, CC-1 would have been prohibited from making payments to ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, in exchange for expediting services. Such payments are precisely the type of "monetary" benefit that registered Filing Representatives are expressly prohibited from giving to City employees "in exchange for special consideration." Indeed, as noted above, the City warns Filing Representatives that such actions are "punishable by imprisonment."

36.    CC-1 had a falling out with ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, in or about early 2023. As a result of that falling out, CC-1 stopped participating in this scheme with SACCAVINO and CORDASCO, and refused to pay SACCAVINO and CORDASCO some of the bribe payments that he owed them for "expediting" work that was already completed.

37.    This scheme involved approximately 30 different projects located all across New York City, including apartment buildings, restaurants, bars, hotels, and other businesses. Four examples of these projects, and the actions for which ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, were paid bribes, are described below.

14

**Project-1**

38.     Project-1 involved a fire alarm plan review and inspection for an apartment building in Brooklyn. The owner or developer of Project-1 hired a registered Filing Representative— referred to above as Filing Representative-1—to handle these matters before the BFP. In late September 2022, Filing Representative-1 then hired and paid the CC-1 Company more than $7,000 to expedite the Project-1 plan review and inspection. For their part, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, caused the BFP to expedite these matters, in exchange for bribe payments from the CC-1 Company. More specifically:

*Project-1 Plan Review*

39.     The fire alarm plan for Project-1 was submitted to the BFP for review on or about September 27, 2022. About sixteen days later, on or about October 13, 2022, the plan was approved by the BFP. At that same time, the general wait time for a fire alarm plan review was approximately 8 to 10 weeks. During the approximately 16 days that the Project-1 plan review application was pending, the following occurred:

a.     On or about September 27, 2022, Filing Representative-1 filed the Project-1 plan review application with the BFP.

b.     Five days later, on or about October 2, 2022, Filing Representative-1 emailed CC-1 with the application number for the Project-1 filing. Filing Representative-1 stated, in substance and in part, that the client had paid Filing Representative-1, and that Filing Representative-1 would "zelle" CC-1 once that payment cleared.

c.     The next day, on or about October 3, 2022, CC-1 sent Filing Representative-1 an invoice from the CC-1 Company, charging $4,500 for "Fire Alarm Review" services for Project-1.

d.      Two days later, on or about October 5, 2022, CC-1 received a $4,500 Zelle payment from Filing Representative-1 for Project-1, referencing the prior invoice.

e.      On or about October 6, 2022, CC-1 sent the Project-1 application information to ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, in the Group Chat.  CORDASCO responded: "Ok we'll have the team take a look."  CORDASCO also wrote: "This is a plan review and it's going to need an inspection.  Are we getting wowed with the price? How much?"  A short time later, CORDASCO emailed the chief plan examiners responsible for supervising the BFP's fire alarm system plan reviews and asked in part: "[C]an we please move forward and review this job at [the Project-1 address]?"  One of those chief plan examiners responded in part that he would "forward this along right away and arrange for it to be reviewed by tomorrow/Tuesday."

f.      Six days later, on or about October 12, 2022, the same chief plan examiner emailed CORDASCO stating in part that the Project-1 "application has been reviewed and is slated to be approved by the plan examiner.  The applicant should be getting the results back in 1-2 business days."  Approximately 15 minutes later, CORDASCO wrote in the Group Chat that Project-1 would be "approved before the end of the day, paperwork should be available in the portal sometime tomorrow."

g.      Finally, on or about October 13, 2022, or a total of 16 days after the Project-1 plan review application had been filed, the BFP approved that application.  That same day, SACCAVINO asked about the price being charged for Project-1, writing in part: "I know we finished [Project-1] yesterday with Plan Review, what did we charge"?  CC-1 did not respond.

*Project-1 Inspection*

40.     After the Project-1 plan review was complete, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, arranged for Project-1 to obtain an earlier inspection date than the BFP had originally offered, in exchange for bribe payments from the CC-1 Company. Specifically:

        a.      On or about October 20, 2022, about a week after the BFP had approved the Project-1 plan, SACCAVINO, CORDASCO, and CC-1 discussed obtaining an earlier inspection date for Project-1, and the price being charged both for plan review and inspection on the project.

        b.      CC-1 wrote in the Group Chat that the Project-1 inspection had been scheduled "for 11/16" but "[t]hey [*i.e.*, the customer] would like next week 10/27 or 10/28." CORDASO responded, in part: "Before I ask for date change for [Project-1], any time preference or anytime 10/27, 10/28?" After CC-1 confirmed that the customer would be grateful "just to have those dates," CORDASCO responded that he was "on a call" with the Executive Director—who supervised the Plan Review and Fire Alarms Inspection Unit—and would send an email "ASAP." Approximately 10 minutes later, SACCAVINO asked CC-1: "[W]hat are we charging for the inspection on [Project-1]. I know we are getting 3,500 to 4,000 for Plan Review?" CC-1 did not respond. SACCAVINO further wrote that the Executive Director "will work on getting back to me on for date change on [Project-1]!!!"

        c.      That same day, SACCAVINO and CORDASCO expressed frustration that CC-1 was not confirming the payments the CC-1 Company would be receiving for "expediting" being performed for CC-1's clients. For example, after CC-1 failed to respond to SACCAVINO's question about the price being charged for the Project-1 inspection, SACCAVINO wrote in the Group Chat, asking CC-1 to "please take a minute to answer the questions I sent you!"

17

CORDASCO then commented, in part: "to Anthony's point . . . It shouldn't be difficult to ask what we are getting for these. We've said before, a fire alarm job and range hood job have vastly different review times. We need to know the number attached . . ." CC-1 responded that it was his "part to get this done and collect," and asked SACCAVINO and CORDASCO to "[j]ust please do the other needed part." About a minute later, SACCAVINO asked if the customer could do the Project-1 inspection on "10/27 at 2 pm, does that work?" CC-1 confirmed, writing: "Yes done."

   d. Also on or about October 20, 2022, CC-1 sent Filing Representative-1 an invoice from the CC-1 Company, charging $2,720 for a "Fire Alarm inspection" for Project-1. The next day, CC-1 received a $2,720 Zelle payment from Filing Representative-1 referencing the prior Project-1 invoice.

  41. After receiving more than $7,000 to expedite the Project-1 BFP plan review and inspection, CC-1 made bribe payments to ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants.

### Project-2 and Project-3

  42. Project-2 and Project-3 involved two plan reviews, and one inspection, for fire alarm systems at two hotels near the John F. Kennedy International Airport ("JFK") in Queens. As with Project-1, Filing Representative-1 was the registered representative on these projects, and hired and paid the CC-1 Company more than $16,000 to "expedite" plan reviews and an inspection for these projects. Like they had done for Project-1, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, caused the BFP to expedite these matters, in exchange for bribe payments from the CC-1 Company.

18

*Project-2 Plan Review*

43.    The fire alarm plan for Project-2 was submitted to the BFP for review on or about October 19, 2022.  Six days later, on or about October 25, 2022, the plan was approved by the BFP.  At that time, the general waiting period for a fire alarm plan review was about 8 to 10 weeks.  During the approximately six days that the Project-2 plan review application was pending, the following occurred:

a.    On or about October 19, 2022, Filing Representative-1 filed the Project-2 plan review application with the BFP.

b.    On or about October 20, 2022, CC-1 messaged ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, in the Group Chat to inform them that the fire alarm plan for Project-2 had been filed with the BFP.  In response, CORDASCO wrote that he "didn't ask the team to review [that plan]" and asked SACCAVINO "did you?"  CC-1 explained that he "[g]ave [the plan] to [SACCAVINO] . . . early this week."  CORDASCO then messaged CC-1 to tell him that there was "nothing in our system searching the addr[e]ss for [Project-2].  Can [Filing Representative-1] send us a plan number?"  CC-1, who stated in substance and in part that he was on the phone with Filing Representative-1 at the time, provided CORDASCO with the relevant plan number.  In addition, on or about the same day, CC-1 sent Filing Representative-1 a CC-1 Company invoice charging $4,896 for "Fire Alarm Review" services for Project-2.  Later that same day, CC-1 received a $4,896 Zelle payment from Filing Representative-1, referencing the prior invoice.

c.    The next day, on or about October 21, 2022, CORDASCO sent an email to two BFP employees he oversaw requesting an expedited review of the fire alarm plan for Project-2.  Specifically, CORDASCO emailed the chief plan examiners responsible for overseeing fire alarm

plan reviews and explained that the plan review for Project-2 "was recently submitted, and we are being asked to expedite. I advised Chief Saccavino that we can get to this one sometime next week. Please let me know if we can begin to review early next week?"  About one hour later, the same chief plan examiner responded to CORDASCO and explained that the applicant—*i.e.*, Filing Representative-1—needed to re-file under a different application type and that "When they have refiled, and obtained a new record ID number we can definitely arrange for someone to review the application."  In response, CORDASCO told the chief plan examiner that he—CORDASCO—would "advise the applicant."

      d.    On or about October 24, 2022, CC-1 messaged CORDASCO and SACCAVINO in the Group Chat asking about the "status" of Project-2.  In response, SACCAVINO told CC-1 that the Executive Director was "out today and tomorrow, I just tried to call him, as soon as he calls back, I'll ask where we are at."  About 15 minutes later, CORDASCO messaged CC-1 and SACCAVINO to explain that the Project-2 fire alarm plan had been filed under the wrong application type, such that the BFP had not approved the application.  CC-1 responded to CORDASCO and SACCAVINO writing in part: "10/4 on it now."  About 20 minutes later, CC-1 copied the message that CORDASCO had sent describing the problem with the Project-2 application number and sent it directly to Filing Representative-1.  About five hours after that, CC-1 sent SACCAVINO and CORDASCO the new Project-2 plan number.

      e.    One day later, on or about October 25, 2022, CORDASCO emailed the chief plan examiners for fire alarm plans to give them the "new plan number I received for this job [*i.e.*, Project-2] . . . Can we please have someone take a look at it before the end of the week." In response, one of the chief plan examiners wrote CORDASCO that he would "coordinate with [the other chief plan examiner] and arrange for this application to be reviewed before the end of this

week. We will keep you posted on the status, once that becomes available." About four hours later, the other chief plan examiner emailed CORDASCO and explained that the fire alarm plan for Project-2 "was reviewed, approved, and released today."

<em>Project-2 Inspection</em>

44.     After the fire alarm plan for Project-2 was reviewed and approved, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, arranged for Project-2 to obtain an earlier inspection date than the BFP had originally offered, in exchange for payment from the CC-1 Company. Specifically:

a.     One day after the fire alarm plan for Project-2 was approved, on or about October 26, 2022, the BFP scheduled an inspection of the fire alarm system at Project-2 for December 7, 2022. That same day, CC-1 sent a message to Filing Representative-1 about obtaining an earlier date for the Project-2 fire alarm system inspection in exchange for payment. Specifically, CC-1 wrote, in part: "yes promise didn't forget / inspection 6k / was seeing to bring alittle [sic] more Down [sic] / This will be a very fast inspection date too / So please make sure there [sic] ready."

b.     Two days later, on or about October 28, 2022, CC-1 messaged SACCAVINO and CORDASCO in the Group Chat, sent them a screenshot of a BFP form listing a December 7, 2022 inspection date for Project-2, and asked them for an earlier inspection date of "next Thursday [or] Friday." CORDASCO responded by writing, in part: "10/4, I have to call [the Executive Director] right now. I'll ask." About two and a half hours later, CORDASCO messaged CC-1 again and told him to "tell [Filing Representative-1], for [Project-2] next available ins[p]ection dates are sun 11/6 or Tues 11/8 at 9 am." CC-1 then messaged Filing Representative-1 and wrote, in part: "[a]s of now I have 11/6 Sunday 9am 11/8 Tuesday 9am / Tell

21

them pick these two."   About five minutes later, CC-1 messaged Filing Representative-1 again to confirm that "they want [T]uesday 11/8 9am correct[?]"   Less than a minute after that, CC-1 sent a message in the Group Chat to SACCAVINO and CORDASCO telling them, in sum and substance, that Filing Representative-1 wanted the "11/8 9am" inspection date.   CORDASCO responded: "10-4."   On or about the same day, CC-1 received a $3,264 Zelle payment from Filing Representative-1.

c.    The next day, on or about October 29, 2022, CC-1 received a second $3,264 Zelle payment from Filing Representative-1, which referenced "[Project-2] Inv#04-Expedited Inspection Date-2nd half."

d.    On or about October 31, 2022, an administrative inspector in the Fire Alarm Inspection Unit sent an email to Filing Representative-1 to notify them that the inspection date for the fire alarm system at Project-2 had been changed to November 8, 2022, at 9:00 a.m.

45.    In total, the CC-1 Company received more than $11,000 for expediting the plan review and inspection for Project-2.   In turn, CC-1 made bribe payments to ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants.

<em>Project-3 Plan Review</em>

46.    The fire alarm plan for Project-3, a second hotel near JFK, was submitted to the BFP for review on or about October 21, 2022, again by Filing Representative-1.   About five weeks later, on or about November 28, 2022, the plan was approved by the BFP.   As noted in connection with Project-2, the general waiting period for a fire alarm plan review at that time was approximately 8 to 10 weeks.   During the approximately five weeks that the Project-3 plan review application was pending, the following occurred:

      a.     On or about October 21, 2022, Filling Representative-1 filed the plan review application with the BFP. On or about the same day, CC-1 sent Filing Representative-1 an invoice for $5,440 for "Fire Alarm Review" services for Project-3.

      b.     The next day, on or about October 22, 2022, CC-1 received a $2,720 Zelle payment from Filing Representative-1, which referenced "[Project-3] Inv#03-Expedited Plan Review."

      c.     One day later, on or about October 23, 2022, CC-1 received a second $2,720 Zelle payment from Filing Representative-1 for the same Project-3 "Expedited Plan Review."

      d.     The following day, on or about October 24, 2022, CC-1 messaged ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, in the Group Chat. CC-1 informed SACCAVINO and CORDASCO of the Project-3 plan review application and provided them the plan number. SACCAVINO and CORDASCO each responded acknowledging receipt ("Ok" and "Ok"). CORDASCO also stated that he would "send to the team, let you know when we can start to review."

      e.     Four days later, on or about October 28, 2022, CORDASCO sent an email to the two chief plan examiners responsible for fire alarm plan reviews. The subject line of that email included the plan number for Project-3. CORDASCO asked the chief plan examiners if they could "take a look at this one on Monday?" and gave them the address for Project-3.

      f.     The following Monday, on or about October 31, 2022, one of the chief plan examiners responded to CORDASCO's email stating, in part, that he had "informed the assigned examiner regarding this expedited review request" and would "see what we can do." Later that same day, the second chief plan examiner informed CORDASCO that "the above application was reviewed today 10/31/2022 and issued 'Additional Information Request' status," which indicated

23

that the BFP could not finalize its plan review for Project-3 until the applicant filed a required document with the New York City Department of Buildings ("DOB").

g.    The next day, on or about November 1, 2022, CORDASCO sent an electronic message to CC-1 explaining the delay in approval for the Project-3 plan review. Specifically, CORDASCO wrote, in part: "2nd [hotel] from [Filing Representative-1] was reviewed yesterday. 'Additional Info Request' status, as they need to file a document with DOB before we can review again."    CC-1 replied confirming his understanding ("10/4") and immediately forwarded CORDASCO's explanation to Filing Representative-1.    Filing Representative-1 responded confirming receipt of CC-1's message and that they would call CC-1 shortly.

h.    Nearly three weeks later, on or about November 21, 2022, Filing Representative-1 contacted CC-1 to get an update on the status of the fire alarm plan review for Project-3.    Filing Representative-1 and CC-1 then exchanged a series of messages.    During that exchange, CC-1 directed Filing Representative-1 to "resubmit" the application, explaining that "[t]here's some confusion / I have them waiting now / But put the new job and explanation." Filing Representative-1 told CC-1 that they would resubmit the plan.

i.    On or about November 22, 2022, CC-1 wrote in the Group Chat that "[Filing Representative-1] resubmitted / [They] had to correct paper work" and sent a screenshot of an email from Filing Representative-1 showing that they had resubmitted the Project-3 design plan. CORDASCO wrote back, in part: "Ok thanks."    About 15 minutes later, CC-1 wrote again in the Group Chat to ask if CORDASCO could "check on [Filing Representative-1] to make sure they are processing."    In response, CORDASCO wrote, "OK," and then explained that he "[l]ooked up the record, all updated paperwork submitted. Told my guys to move on it."    At almost the exact same time, CORDASCO sent an email to the two chief plan examiners stating, in part: "I was

24

notified that appropriate documents required have been uploaded. Can we please move on this one," referring to Project-3. A few hours later, CC-1 sent Filing Representative-1 a message confirming that Project-3 would be expedited again, stating, in part: "[t]hey will be pushing on [Project-3] the min[ute] it pops back up from resubmit." Later that same afternoon, one of the chief plan examiners sent an email to CORDASCO explaining that the fire alarm plan for Project-3 had already been reviewed and issued another "Additional Information Request," which asked for a "[m]inor correction" to a particular form.

> j. About one week later, on or about November 28, 2022, Filing Representative-1 sent an email to CC-1 confirming that the Project-3 design plan had been resubmitted yet again and asking CC-1, in part, to "[p]lease push forward as discussed last week." CC-1 sent a screenshot of this email to CORDASCO and SACCAVINO. CORDASCO responded with a thumbs-up emoji. Later that same day, one of the chief plan examiners reviewed and approved the fire alarm plan for Project-3.

47. In total, the CC-1 Company received more than $5,000 for expediting the plan review for Project-3. In turn, CC-1 made bribe payments to ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants.

### Project-4

48. Project-4 involved a rangehood fire suppression system plan review and inspection for a high-end restaurant in Manhattan. A second Filing Representative ("Filing Representative-2") represented the owner of the restaurant before the BFP. After a significant delay in the BFP's review and approval of the rangehood plans for Project-4, Filing Representative-2 hired and paid the CC-1 Company more than $10,000 to "expedite" the plan review and inspection date for Project-4. In turn, ANTHONY SACCAVINO and BRIAN

25

CORDASCO, the defendants, caused the BFP to expedite these matters, in exchange for bribe payments from the CC-1 Company. Specifically:

### *Project-4 Plan Review*

49.     The rangehood plan for Project-4 was first submitted to the BFP for review on or about July 11, 2022. After months of delays by the BFP, and two sets of revisions and resubmissions, the plan was still pending BFP review in or about December 2022. On or about December 8, 2022, Filing Representative-2 hired CC-1 to expedite the review and inspection of the Project-4 rangehood fire suppression system. Eleven days later, on or about December 19, 2022, the BFP reviewed and approved the rangehood plan for Project 4. During December 2022, including the 11 days that passed from the hiring of CC-1 until the approval of the Project-4 plan, the following occurred:

a.     On or about December 2, 2022, Filing Representative-2 and CC-1 exchanged texts messages in advance of a corporate holiday party being hosted by Filing Representative-2's company. These messages reference the expediting services that CC-1 had offered to provide for Filing Representative-2's clients and the desire of both parties to keep the fact of those services secret. Specifically, Filing Representative-2 wrote to CC-1, in part: "[j]ust 1 thing. We aren't letting a lot of people know in the company . . . so let's keep DL, we don't want anyone abusing this lol. / Needs to be thought out." CC-1 responded, in part: "Brother / I am your shadow . . . You guys will look like your [sic] moving clouds and the moon with a touch / Your [sic] get all credits and everything goes thru you guys / chain of command is your [sic] the point / we are your part of your company now [sic] / the more you get credit and recognition the more work we get as a unit."

b.      One week later, on or about December 8, 2022, Filing Representative-2 sent CC-1 a message that Filing Representative-2's company had their "first customer that we want to use your services for. Hopefully we can get this reviewed ASAP. Let me know what you need for [sic] me." Later that night, Filing Representative-2 sent CC-1 the address and plan number for Project-4 and confirmed that the plan was for an "ansel" system, which is another term for a rangehood fire suppression system.

c.      The next day, on or about December 9, 2022, CC-1 wrote in the Group Chat to inform ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, of the details for the new rangehood plan review that needed to be expedited, commenting, in part: "[i]f we can wow them it good [sic] / be good." Later that same day, CC-1 and Filing Representative-2 exchanged text messages about the price of CC-1's expediting services. For example, CC-1 wrote, in part: "Price is 5500 / plus tax / This one address would have been 7/8k to 10-12k plus tax for expedited review / Because your [sic] on the family plan monthly you get the benefits of all."

d.      On or about December 13, 2022, CC-1 sent a message in the Group Chat asking for the status of the Project-4 plan review. In response, CORDASCO wrote, in part: "Ok, targeted for Thursday I was told this morning." CC-1 responded, in part, that he would "update them / Thursday targe[t] complete date." A few hours later, CORDASCO emailed the Project-4 plan number to a BFP employee responsible for reviewing rangehood plans and wrote, in part: "[a]s per our discussion, looking to have this plan reviewed by the end of the week."

e.      The next day, on or about December 14, 2022, the BFP employee to whom CORDASCO had sent the Project-4 plan information the day before responded, in part: "I will send you an update once the plans are reviewed."

27

f.      The day after that, on or about Thursday, December 15, 2022—the "target" completion date for the Project-4 plan review—CC-1 wrote in the Group Chat to check on the status of the review.   SACCAVINO and CORDASCO did not respond.

g.      On or about December 16, 2022, CC-1 sent a CC-1 Company invoice to Filing Representative-2, charging $5,998.13 for the "Fire Application Review Expedite" for Project-4.

h.      A few days later, on or about December 19, 2022, Filing Representative-2 sent a text message to CC-1 asking if there had been "any movement on [Project-4]."   In response, CC-1 wrote, in part: "Hey happy hannukka Brother / Yes you should have gotten email / one sec / Let me call down now asap to see why you didn't get it."   About one hour later, CC-1 informed Filing Representative-2 that his contacts were in a meeting but that he expected an update call from them shortly.   Specifically, CC-1 wrote, in part: "[t]here [sic] in there [sic] Monday morning recap meeting as soon as they get out I get first calls."   Shortly thereafter, CORDASCO sent a text message to a BFP employee asking for an update on the Project-4 plan review and explaining, in part, that "[another BFP employee] was working [on the plan] . . . please let me know when it's done. Applicant reached out this morning. Appreciate it."   In response, the BFP employee wrote, in part: "Good morning Chief Cordasco. I hope all []is well. I will get an update on this plans [sic] . . . by the end of the day."   CORDASCO wrote back: "Ok awesome thank you!"   Later that same day, the BFP reviewed and approved the rangehood plan for Project-4.

### *Project-4 Inspection*

50.      In exchange for payment from CC-1, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, also arranged for the BFP to inspect the Project-4 rangehood installation just three days after the BFP plan approval.   Specifically:

28

a.     The day after the Project-4 rangehood plan had been approved, on or about December 20, 2022, Filing Representative-2 messaged CC-1 asking about obtaining an expedited inspection date.   Specifically, Filing Representative-2 asked: "[h]ow crazy would it be to get a test scheduled for Thur[sday]?"   CC-1 responded, in part: "[l]et me check this morning if we can get it Thursday / (if we have fri/sat/Sunday) would that work too[?]" Filing Representative-2 confirmed that "Thur or Friday should work."

b.     The next day, on or about December 21, 2022, CORDASCO sent an email to the chief inspector who oversaw rangehood inspections at the BFP (the "Chief Inspector").   In that email, which copied SACCAVINO, CORDASCO asked for a specific inspection date for Project-4, explaining, in part: "[a]s per Chief Saccavino, the applicant is looking for an inspection on Thursday or Friday of this week."   The Chief Inspector responded, in part, that he would "provide an inspector for Thursday (12/22/22)."   About an hour later, the Chief Inspector again wrote to confirm that the inspection was "[s]cheduled for 12/22/22 at 11:00 am."   About one minute after that, CORDASCO wrote in the Group Chat that "11am is the inspection time tomorrow for [Project-4]."   CC-1 responded: "10/4."   At around the same time, CC-1 sent Filing Representative-2 a message stating, in part: "11am is the inspection time tomorrow for [Project-4] / But be ready for 10am just in case."

c.     The next day, on or about December 22, 2022, the Chief Inspector sent CORDASCO and SACCAVINO an email confirming that Project-4's rangehood fire suppression system "was tested and approved."   Less than five minutes later, CORDASCO wrote in the Group Chat that "[Project-4] system tested and approved today. Another Hanukkah present."   CC-1 and SACCAVINO both acknowledged the message, with SACCAVINO responding: "Ok great."

29

d.    On or about December 26, 2022, CC-1 and Filing Representative-2 discussed the price that CC-1's contacts were charging for expediting the Project-4 inspection. Specifically, CC-1 wrote, in part: "[t]alking to them now / Letting them know your friends of ours / and part of our team."   About 10 minutes later, CC-1 wrote further and in part that: "think your [sic] be happy / Normally every step they want to get paid on especially when it's a big ask for an [sic] quick inspection / I explain your part of our monthly partnership / that's why you get that vip / Project autho[rization] letter and inspection 5k plus tax / Normally letter would be 1k-1500 for expediting / And inspection of that quickness during peak would of [sic] been 9500/10k just for that inspection / Instead of that $11500 got you at 5k plus tax for both."   Filing Representative-2 responded, in part: "[t]hanks buddy / Appreciate it."   Later that day, CC-1 sent a CC-1 Company invoice to Filing Representative-2 charging $5,443.75 for "Fire Application Inspection" for Project-4.

e.    The next day, on or about December 27, 2022, Filing Representative-2's company wrote two checks to the CC-1 Company for $5,998.13 and $5,443.75 as payment for the expedited plan review and inspection for Project-4.

51.    After receiving more than $10,000 to expedite the Project-4 plan review and inspection, CC-1 made bribe payments to ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants.

### *The Fire Guard Scheme*

52.    During the same period that the CC-1 Company was offering "expediting" services to customers with matters pending before the BFP, the CC-1 Company, at the suggestion of ANTHONY SACCAVINO, the defendant, also provided customers with fire guard services.

53.     Fire guards are individuals certified by the BFP's Public Certification Unit and employed by private businesses to stand watch for fires in buildings that lack operating fire protection systems, including during new construction, planned repairs, and unplanned outages. The number of fire guards required in a particular building depends on the size and use of the building. When required, a building must have fire guard coverage 24 hours a day. As part of its duties, BFP inspectors are authorized to order buildings to have fire guards conducting fire watch, including on an immediate, emergency basis. In addition, FDNY personnel may be present at a building to give directions to fire guards performing fire watch.

54.     As part of the CC-1 Company's fire guard business, CC-1 maintained a roster of fire guards he would make available to customers when they needed fire guard coverage. These fire guards included a number of current and former FDNY firefighters. CC-1 paid each fire guard an hourly wage and charged his customers a mark-up on that hourly wage, netting him a profit. ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, personally worked shifts on these fire guard jobs, primarily to supervise other fire guards, and earned an hourly wage from the CC-1 Company for doing so. CC-1 also initially split the profits from fire guard work roughly evenly with SACCAVINO and, later, with both SACCAVINO and CORDASCO. Accordingly, when SACCAVINO or CORDASCO had personally worked on a particular fire guard job, they would receive double-payment—first for their own wages, and then their cut of the CC-1 Company's profits. The CC-1 Company continued to provide fire guard services, and to divide the profits of that work with SACCAVINO and CORDASCO, throughout the relevant period.

55.     The CC-1 Company's fire guard business conflicted with the official roles of ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants. As active BFP Chiefs,

31

SACCAVINO and CORDASCO were high-ranking members of the very same division of the FDNY that was responsible for certifying and regulating the use of fire guards in New York City. At the same time, SACCAVINO and CORDASCO were being paid by the CC-1 Company to supervise fire guards and received a portion of the profits from CC-1's fire guard business. This clear conflict of interest was not disclosed to the City by SACCAVINO or CORDASCO. To the contrary, CORDASCO falsely claimed in his 2022 mandatory financial disclosure form that his company, the Cordasco Company, was "involved in the entertainment and hospitality industry" and that its business had "no bearing on the title [CORDASCO] held in city service." In truth and fact, the Cordasco Company was used to receive payments from the CC-1 Company for CORDASCO's fire guard work and the fire guard-related profits from the CC-1 Company.

56.    In addition, on at least one occasion, ANTHONY SACCAVINO, the defendant, used information that he obtained as a BFP Chief in order to generate a business lead for the CC-1 Company. Specifically, in or about the fall of 2021, SACCAVINO directed CC-1 to contact a business that was previously unknown to CC-1 and to offer fire guard services to that business. The business owner informed CC-1 that the business had just been ordered by the FDNY to put fire guards in place and agreed to hire the CC-1 Company. In other words, SACCAVINO used his inside knowledge of official FDNY business to benefit the CC-1 Company for his own financial gain.

### Lies and Omissions to Conceal the Bribery and Fire Guard Schemes

57.    During the existence of the bribery scheme with CC-1, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, repeatedly lied to conceal the existence of the scheme and their roles in it. Their lies included, but were not limited to: (1) false claims that customers of the CC-1 Company were being given preferential treatment by the BFP because they appeared

32

on the City Hall List or were otherwise being prioritized by City Hall officials; and (2) false or incomplete financial disclosures filed with the City, which failed to disclose their financial dealings, including on BFP-related matters, with CC-1 and the CC-1 Company.

58.     First, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, used the City Hall List to conceal their involvement in the bribery scheme with CC-1. Specifically, on at least two occasions, in or about 2021 and 2022, SACCAVINO and CORDASCO falsely claimed to other BFP personnel that they had been asked or instructed by the DMO or the IGA to prioritize particular projects, as would be true if those projects appeared on the City Hall List. On multiple other occasions, SACCAVINO and CORDASCO gave BFP personnel who were instructed to prioritize requests for CC-1's customers the false impression, although without specifically mentioning the DMO or the IGA, that the prioritization was necessary because of requests that had come from City Hall or senior FDNY officials. In truth and fact, and as SACCAVINO and CORDASCO well knew, these projects did not appear on the City Hall List or were otherwise the subject of priority requests from City Hall or senior FDNY officials; rather, the projects were for customers of the CC-1 Company.

59.     For example, on or about July 15, 2021, ANTHONY SACCAVINO, the defendant, told a BFP employee responsible for rangehood plan reviews that he had "received an email this morning from the Deputy Mayor's Office with regard" to a particular plan review. SACCAVINO claimed that the DMO was "requesting an expedite," and asked the BFP employee to "please look into this." BRIAN CORDASCO, the defendant, who was copied on that prior email, responded in part by adding: "Can you please move this along since it's on DMO list and advise on status?" These claims were false. Neither SACCAVINO nor CORDASCO received any emails from the DMO on July 15, 2021. Moreover, the project they claimed was on the City Hall List was not on

33

that list. Rather, SACCAVINO and CORDASCO instructed BFP personnel to expedite the plan review for this project because they were being paid to do so by CC-1.

60.     As another example, on or about June 6, 2022, BRIAN CORDASCO, the defendant, instructed BFP personnel to expedite a project authorization and inspection of a rangehood fire suppression system for a Manhattan restaurant. In doing so, CORDASCO told the relevant BFP employee, in part, that "this applicant reached out to Intergov [*i.e.,* IGA], they just filed for a project authorization on Friday 6/3, but looking for it to be completed asap so they can get inspected before the end of the week." That was a lie. Neither CORDASCO nor ANTHONY SACCAVINO, the defendant, received any emails from IGA about this project. In addition, this project did not appear on the City Hall List. Less than 15 minutes after CORDASCO made this expediting request, the relevant BFP employee told CORDASCO that the project authorization had been created and issued. In exchange for expediting this project, SACCAVINO, CORDASCO, and CC-1 were collectively paid a total of approximately $6,000.

61.     Second, both ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, made false or misleading statements in mandatory financial disclosure forms that were electronically filed and transmitted to the City of New York's Conflict of Interest Board, located in Manhattan. These forms were required to be filed as part of SACCAVINO and CORDASCO's employment at the FDNY and were designed to identify conflicts of interest between that official employment and outside financial dealings—such as the bribery and fire guard schemes with CC-1.

62.     Specifically, in or about 2021, 2022, and 2023, ANTHONY SACCAVINO, the defendant, electronically filed mandatory financial disclosure forms with the City. On those forms, SACCAVINO did not disclose any outside employment or business with CC-1, the CC-1

34

Company, or BRIAN CORDASCO, the defendant.   In response to questions about his spouse's employment and businesses, SACCAVINO listed the Saccavino Wife Company as his wife's employer and described the company as engaging in tax preparation services.   SACCAVINO did not disclose that CC-1 had made payments to the Saccavino Wife Company.

63.     For his part, BRIAN CORDASCO, the defendant, electronically filed a mandatory financial disclosure form with the City in or about 2022.   On that form, CORDASCO did not disclose any outside employment or business with CC-1, the CC-1 Company, or ANTHONY SACCAVINO, the defendant.   When asked about outside employment, CORDASCO disclosed, in part, that he had "Non-City Employment" with the Cordasco Company.   He described his position at the company as a "Consultant" and claimed that the Cordasco Company "[p]rovide[s] consulting services and logistics for events, trade shows and other large industry gatherings."   In filling out this disclosure form, CORDASCO requested in writing that his involvement with the Cordasco Company not be made public pursuant to applicable open-records laws, stating in relevant part:

> I believe the LLC I started should not be made public as it is involved in the entertainment and hospitality industry and *does not conflict with the duties and responsibilities I perform with the FDNY*. A member performing city service is allowed to own and operate a second business. The results and financial performance of which has no bearing on the title held in city service and should remain private.

(emphasis added).   CORDASCO did not disclose that CC-1 had made payments to the Cordasco Company.

## The Defendants' False Statements to the FBI

64.     In or about February 2024, Special Agents with the FBI conducted interviews of ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants.   During those interviews,

SACCAVINO and CORDASCO each made false statements to federal agents to conceal their involvement in the bribery scheme with CC-1. For example, SACCAVINO falsely denied ever providing a benefit to CC-1 related to expediting, inspections, or plans, and falsely denied receiving payments from CC-1 in connection with such benefits. Likewise, CORDASCO falsely denied expediting or attempting to expedite BFP requests for CC-1, and denied receiving payments from CC-1 in connection with CORDASCO's role in the BFP. SACCAVINO and CORDASCO each persisted in these false statements despite being warned repeatedly that it was a crime for them to lie to federal agents.

## COUNT ONE
### (Conspiracy to Solicit and Receive a Bribe by Agent of Organization Receiving Federal Funds)

The Grand Jury charges:

65.     The allegations contained in paragraphs 1 through 64 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

66.     From at least in or about 2021 through in or about 2023, in the Southern District of New York and elsewhere, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, solicitation and receipt of a bribe by an agent of an organization receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(1)(B).

67.     It was a part and object of the conspiracy that ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, being agents of a local government, and an agency thereof, to wit, the FDNY, which received, in each of the calendar years 2021 through 2023, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee,

36

insurance, and other form of federal assistance, would and did corruptly solicit and demand for the benefit of a person, and accept and agree to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the FDNY involving a thing of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B), to wit, SACCAVINO and CORDASCO agreed to and did solicit and accept tens of thousands of dollars in bribe payments from CC-1 in exchange for providing customers of the CC-1 Company with special treatment by the BFP, including expedited plan reviews and priority inspection dates, that were not otherwise available to the general public.

## Overt Acts

68.     In furtherance of the conspiracy and to effect the illegal object thereof, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, committed and caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.     In or about 2021, 2022, and 2023, CC-1 personally delivered bribes in the form of cash and check payments to SACCAVINO and CORDASCO.  Among other locations, CC-1 delivered these bribe payments to SACCAVINO and CORDASCO during meetings at the BFP headquarters in Brooklyn and during steakhouse dinners in Manhattan.

b.     In or about December 2022, in connection with Project-4, SACCAVINO and CORDASCO caused a BFP inspector to conduct an expedited inspection of a building located in Manhattan, in exchange for bribe payments from CC-1.

c.     In or about 2021, 2022, and 2023, SACCAVINO electronically filed mandatory disclosure forms that were transmitted to the City of New York's Conflict of Interest Board, located in Manhattan, that failed to truthfully disclose SACCAVINO's dealings with CC-1,

37

the CC-1 Company, and CORDASCO, including SACCAVINO's use of the Saccavino Wife Company to receive bribe payments from CC-1.

            d.     In or about 2022, CORDASCO electronically filed a mandatory disclosure form that was transmitted to the City of New York's Conflict of Interest Board, located in Manhattan, that failed to truthfully disclose CORDASCO's dealings with CC-1, the CC-1 Company, and SACCAVINO, including CORDASCO's use of the Cordasco Company to receive bribe payments from CC-1.

(Title 18, United States Code, Section 371.)

<strong>COUNT TWO</strong>

<strong>(Solicitation and Receipt of a Bribe by Agent of Organization Receiving Federal Funds)</strong>

The Grand Jury further charges:

69.     The allegations contained in paragraphs 1 through 64 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

70.     From at least in or about 2021 through in or about 2023, in the Southern District of New York and elsewhere, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, being agents of a local government, and an agency thereof, to wit, the FDNY, which received, in each of the calendar years 2021 through 2023, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the FDNY involving a thing of value of $5,000 and more, to wit, SACCAVINO and CORDASCO agreed to and did solicit and accept tens of thousands of dollars in bribe payments from CC-1 in exchange for providing customers of

38

the CC-1 Company with special treatment by the BFP, including expedited plan reviews and priority inspection dates, that were not otherwise available to the general public.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT THREE
### (Conspiracy to Commit Honest Services Wire Fraud)

The Grand Jury further charges:

71.     The allegations contained in paragraphs 1 through 64 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

72.     From at least in or about 2021 through in or about 2023, in the Southern District of New York and elsewhere, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

73.     It was a part and object of the conspiracy that ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public and the FDNY of their intangible right to the honest services of SACCAVINO and CORDASCO, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, SACCAVINO and CORDASCO agreed to and did solicit and accept tens of thousands of dollars in bribe payments from CC-1 in exchange for providing customers of the CC-1 Company with special treatment by the BFP, including expedited plan reviews and priority inspection dates that were not otherwise available to the general public, and transmitted and caused

to be transmitted electronic communications, including emails, to and from the Southern District of New York and elsewhere in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Honest Services Wire Fraud)

The Grand Jury further charges:

74.    The allegations contained in paragraphs 1 through 64 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

75.    From at least in or about 2021 through in or about 2023, in the Southern District of New York and elsewhere, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and to deprive the public and the FDNY of their intangible right to the honest services of SACCAVINO and CORDASCO, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SACCAVINO and CORDASCO participated in a scheme to solicit and accept tens of thousands of dollars in bribe payments from CC-1 in exchange for providing customers of the CC-1 Company with special treatment by the BFP, including expedited plan reviews and priority inspection dates that were not otherwise available to the general public, and transmitted and caused to be transmitted electronic communications, including emails, to and from the Southern District of New York and elsewhere in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1346, and 2).

## COUNT FIVE
### (False Statements by ANTHONY SACCAVINO)

The Grand Jury further charges:

76.     The allegations contained in paragraphs 1 through 64 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

77.     On or about February 15, 2024, in the Southern District of New York and elsewhere, ANTHONY SACCAVINO, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, and made a materially false, fictitious, and fraudulent statement and representation, to wit, during an interview with Special Agents of the FBI, SACCAVINO (a) falsely stated, in sum and substance, that he did not provide any benefit to CC-1 related to expediting, inspections, or plan reviews at the BFP, when, in truth and fact, SACCAVINO had repeatedly provided benefits to CC-1 related to expediting, inspections, and plan reviews at the BFP, and (b) falsely denied, in sum and substance, receiving payments from CC-1 in connection with providing such benefits to CC-1, when, in truth and fact, SACCAVINO had repeatedly received payments from CC-1 in connection with providing such benefits to CC-1.

(Title 18, United States Code, Sections 1001(a)(1) & (2).)

## COUNT SIX
### (False Statements by BRIAN CORDASCO)

The Grand Jury further charges:

78.     The allegations contained in paragraphs 1 through 64 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

41

79.    On or about February 15, 2024, in the Southern District of New York and elsewhere, BRIAN CORDASCO, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, and made a materially false, fictitious, and fraudulent statement and representation, to wit, during an interview with Special Agents of the FBI, CORDASCO (a) falsely stated that he did not expedite or attempt to expedite any BFP requests for CC-1, when, in truth and fact, CORDASCO had repeatedly expedited and attempted to expedite BFP requests for CC-1, and (b) falsely denied receiving payments from CC-1 in connection with CORDASCO's role in the BFP, when, in truth and fact, CORDASCO had repeatedly received payments from CC-1 in connection with CORDASCO's role in the BFP.

(Title 18, United States Code, Sections 1001(a)(1) & (2).)

## FORFEITURE ALLEGATIONS

80.    As a result of committing the offenses alleged in Count One through Four of this Indictment, ANTHONY SACCAVINO and BRIAN CORDASCO, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## Substitute Assets Provision

81.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

Damian Williams

FOREPERSON

DAMIAN WILLIAMS
United States Attorney

43