

U.S. Department of Justice

United States Attorney
Southern District of New York

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 7, 2025

**BY ECF**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Anthony Saccavino*, 24 Cr. 537 (LJL)

Dear Judge Liman:

    Defendant Anthony Saccavino is scheduled to be sentenced on May 14, 2025, at 10:30 a.m., having pled guilty to Count One of Indictment 24 Cr. 537 (LJL) (the "Indictment"), which charged Saccavino with conspiracy to solicit and receive a bribe as an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 371. The parties and Probation Office are in agreement that under the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), the Guidelines sentence is 60 months' imprisonment and the applicable fine range is between $30,000 and $250,000. For the reasons below, the Government submits that a sentence of no less than 30 months' imprisonment—a substantial downward variance from the recommended Guidelines sentence—and a substantial fine would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

    **I.**    **Background**

        **A. Relevant Conduct**

    For nearly three years, Saccavino, a member of the New York City Fire Department ("FDNY"), led a conspiracy that traded on his high rank and authority within the FDNY by providing special treatment to select members of the public in exchange for bribes. In so doing, Saccavino betrayed the trust that the public and his fellow firefighters placed in him as a leader of a cherished government institution. He placed his greed—his own desire for financial gain—above the commitment to honor and integrity that is embodied in the very mission of the FDNY.[1]

---

[1] *See* FDNY, Mission & Values, https://www.nyc.gov/site/fdny/about/overview/mission-and-values/mission.page.

### 1. The Conspiracy

Saccavino was the mastermind of the conspiracy. In May 2020, after approximately 24 years as a uniformed member of the FDNY, Saccavino began a tour of duty at the Bureau of Fire Prevention ("BFP"), the arm of the FDNY responsible for oversight of the installation and maintenance of fire safety and suppression systems in commercial and residential buildings throughout the City. (PSR ¶¶ 18-19). By the time Saccavino joined BFP, he had already held multiple roles within the FDNY, having led firehouses and battalions, and earlier enjoyed a brief career as an officer with the New York City Police Department. (PSR ¶ ¶15, 89). He was now taking on a leadership role within a unit of hundreds of employees and responsible for advancing public safety through fire prevention. (PSR ¶ 19). At all relevant times, BFP's responsibilities have included reviewing plans submitted for the installation of fire safety and suppression systems, as well as inspections of those same systems once they are installed. (*Id*.) In many cases, BFP approvals of plan reviews and BFP inspections are required before a building can be occupied or opened to the public. (*Id*.). In virtually all cases, by policy, the BFP engages in plan reviews and inspections on a first-come-first-served basis. (PSR ¶¶ 21-22).

The conspiracy arose from a series of conversations beginning in late 2020 between Saccavino and a recently retired FDNY colleague, Henry Santiago, Jr. The two spoke about going into business together to provide consulting and expediting services to commercial and residential building owners with business before the BFP. (PSR ¶ 27). They settled on Santiago serving as the face of a fire-safety business with Saccavino as a silent partner, working discretely within the BFP to help Santiago's "clients" achieve expedited and valuable services from the BFP in exchange for bribes. (*Id*.) Later on, Brian Cordasco, another high-ranking FDNY member who worked under Saccavino at the BFP, joined the conspiracy as a second silent partner. (*Id*.) Altogether, the "business" generated revenues of approximately $190,000 from entities with business before the BFP. (PSR ¶ 32).

In exchange for these payments, and with Cordasco's assistance, Saccavino provided Santiago's "clients" with preferential treatment and access to fast-tracked plan reviews and inspections that were not available to the general public. These services from Saccavino and Cordasco were particularly valuable when the conspiracy first took off—a time when COVID-related staffing shortages and backlogs meant that the general public had to wait many more weeks or months to get their BFP applications resolved. (PSR ¶ 21).

The power and influence that Saccavino and Cordasco exercised within the BFP were critical to the conspiracy's success. In exchange for payments from Santiago, Saccavino and Cordasco used their positions and access to information to insist that subordinates expedite matters on behalf of Santiago's clients, to ask for status updates on those matters, and, where needed, to reallocate BFP personnel and resources to ensure that Santiago's paying clients were in fact receiving preferential treatment from the BFP. (*See generally* PSR ¶ 34). Indeed, Saccavino and Cordasco used their authority as BFP Chiefs to reorganize the BFP to consolidate the responsibility for plan reviews and inspections into a single unit, in part to make it easier to expedite both plan reviews and inspections on behalf of bribe-paying customers of Santiago's company. (PSR ¶ 25). To advance this goal even further, Saccavino and Cordasco placed a trusted (albeit unwitting) BFP employee at the head of this newly consolidated unit, and repeatedly directed him to expedite plan

reviews and inspections for Santiago's clients and in exchange for payments to Saccavino and Cordasco from Santiago. (*Id.*).

### 2. Concealment of the Conspiracy

The bribery conspiracy concluded in early 2023—more than a year before the investigation that led to Saccavino's arrest became overt—but not because its members had a change in heart. To the contrary, the conspiracy appears to have concluded solely because of internal strife among its members. (PSR ¶ 34). In particular, Santiago—the bribe payor—came to distrust Saccavino and Cordasco, and the Government has every reason to believe that the conspiracy would have continued but for that distrust.

Prior to the conspiracy's conclusion, Saccavino employed various forms of deception and lies to keep the conspiracy operating smoothly. For example, Saccavino took care to ensure that he deposited many of the bribe payments in a bank account held in the name and under the control of a tax-preparation business operated by Saccavino's wife. (PSR ¶ 32). By doing so, Saccavino dressed up bribe payments as though they were payments for legitimate services rendered by his wife, thereby exposing his wife (in addition to himself) to potential criminal liability. In addition, on mandatory financial disclosure forms filed with the City, Saccavino routinely described his wife's business as completely unrelated to his work at the FDNY when, in fact, Saccavino was using that business as a vehicle to accept bribes. (PSR ¶ 41). All of these lies were aimed at concealing the illegal bargain that Saccavino struck with Santiago.

Saccavino also took pains to deceive his subordinates at the BFP into believing any preferential treatment he requested for Santiago's clients was at the behest of City Hall as opposed to his own pecuniary interests. It was common knowledge within the FDNY during the conspiracy that City Hall would at times ask the BFP to give priority treatment to certain projects. (PSR ¶ 24). On several occasions, when Saccavino and Cordasco directed their BFP subordinates to expedite plan reviews and inspections for the benefit of Santiago's clients, Saccavino and Cordasco falsely told BFP personnel that those expediting requests had come from City Hall or other components of City government. In fact, these projects were fast-tracked because of the bribe payments funneled from Santiago to Cordasco and Saccavino. (PSR ¶ 40).

### 3. Saccavino's Lies to the FBI

Several months after the conspiracy ended (and at a time when Saccavino had the benefit of several months of time to reflect on his wrongdoing), Saccavino lied to FBI agents. On February 29, 2024, federal agents executed a search warrant upon Saccavino's premises and person in connection with the investigation that led to his arrest. After he agreed to a voluntary interview with federal agents, Saccavino lied—and did so in multiple ways. (PSR ¶ 44). Saccavino falsely denied ever engaging in official acts on behalf of Santiago and falsely denied receiving payments from Santiago in connection with any matters before the BFP. (*Id.*). Saccavino persisted in these false statements despite receiving repeated warnings from federal agents that it was a crime for him to lie to them. (*Id.*).

### 4. The Fireguard Scheme

In addition to their bribery scheme, the corrupt relationship between Cordasco, Saccavino, and Santiago involved a separate conflict of interest in the form of a scheme to operate a side business that provided fire guards to commercial entities under the supervision of the BFP. (PSR ¶¶ 35-38). Fire guards are individuals certified by the BFP's Public Certification Unit and employed by private businesses to stand watch for fires in buildings that lack operating fire protection systems, including during new construction, planned repairs, and unplanned outages. (PSR ¶ 35.) As part of the fire guard scheme, Cordasco and Saccavino worked as fire guard supervisors under Santiago's company, and shared in the profits that Santiago's company earned hiring third parties as fire guards. (*Id.* ¶ 36). Neither Cordasco nor Saccavino disclosed to the BFP or the City the conflict of interest inherent in this scheme—*i.e.*, that while serving as high-ranking members of the very same division of the FDNY that was responsible for certifying and regulating the use of fire guards in New York City, they were also being paid by Santiago's company to supervise fire guards and received a portion of the profits from Santiago's fire guard business. (*Id.* ¶ 37).

### B. Guilty Plea and Sentencing Guidelines

On January 29, 2025, Saccavino pled guilty to Count One of the Indictment pursuant to a written plea agreement with the Government. In the plea agreement, the parties calculated the applicable offense level as 29, and Saccavino's Criminal History Category as I. As the parties recognized in the plea agreement, although these calculations would normally result in a Guidelines range of 81 to 108 months' imprisonment, pursuant to U.S.S.G. § 5G1.1 the Guidelines range is reduced to 60 months' imprisonment in accordance with the statutory maximum sentence for Count One. The plea agreement further specified that the applicable fine range under the Guidelines is $30,000 to $250,000. The Probation Office's Guidelines calculation is in accord with the parties' calculation. (PSR ¶ 95).

### C. The Probation Office's Recommendation

The Probation Office recommends the Court vary downward and impose a custodial term of imprisonment of 20 months and a fine of $30,000. (PSR p. 39). That recommendation appears to be driven substantially by "all the good [Saccavino] has done" through his work as a firefighter, including by "put[ting] the safety and well-being of others above his own, and undoubtedly never ask[ing] for praise or acknowledgment." (PSR p. 40). The Probation Office's recommendation also appears to be based in substantial part on this Court's imposition upon Cordasco of a custodial sentence of 20 months' imprisonment. The Probation Office reasons that Cordasco "held a similar role in the offense" to Saccavino such that Saccavino (in the view of the Probation Office) should receive a similar sentence to Cordasco's. (*Id.*).

### D. The Defendant's Sentencing Submission

In his sentencing memorandum, Saccavino requests "a sentence of two years['] probation, a condition of which is intermittent confinement during the first year of probation." (Def. Mem. 1). Saccavino primarily argues such a sentence is warranted to mitigate against the effects a term

of incarceration will have on Saccavino's wife and children, and to address his medical ailments stemming from his work at Ground Zero in the aftermath of the September 11, 2001 terrorist attack in New York City. (*Id*. at 3, 10).

## II. Legal Standard

The Guidelines, while no longer mandatory, still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

## III. Discussion

For the reasons set forth below, a sentence of not less than 30 months' imprisonment and a substantial fine within the applicable Guidelines range would be sufficient but not greater than necessary in this case. Such a sentence is supported by the seriousness of the offense; the defendant's history and characteristics; the need to promote respect for the law and the need for

deterrence; and the need for just punishment and for the sentence imposed to take into account Saccavino's culpability relative to Cordasco's.

### A. The Seriousness of the Offense

Saccavino's conduct was undoubtedly serious. In accepting bribes in exchange for preferential treatment before the BFP, Saccavino "betrayed the trust of the Fire Department and the people of the City of New York." (Cordasco Sentencing Tr. 31). Through his actions, Saccavino undermined the public's trust in our government generally but more specifically in the institution of the FDNY itself. He undermined the public's belief that the FDNY—and the hardworking men and women who make up its rank and file—should serve *all* New Yorkers, no matter their connections to power or wealth. As this Court has recognized, "[i]f the conduct that [Cordasco] and Mr. Saccavino engaged in became normalized, it would breed cynicism that would undermine government and trust in the fair and impartial administration of the laws." (*Id.*).

Just as troubling are the lies Saccavino told to cover up his crimes—especially his repeated lies to FBI agents during a voluntary interview. At all times during that interview, Saccavino had the choice not to speak. But Saccavino chose otherwise, and when he did so, he lied repeatedly. His lies undermined the search for truth by law enforcement and "[t]he citizen's duty to raise the 'hue and cry' and report felonies to the authorities." *Roberts v. United States*, 445 U.S. 552, 557 (1980). As a public servant himself, Saccavino knew of this duty more than most. But he lied anyway. And when given a chance to correct his false statements during his interview, he doubled down rather than come clean.

### B. Saccavino's History and Characteristics

Saccavino's history and characteristics militate in favor of the Government's recommended sentence. By some measures, Saccavino's arrival at the BFP in 2020 was the pinnacle of his career as a uniformed firefighter and in public service. Earlier in his career, Saccavino worked as a corrections officer and then a patrol officer with the New York City Police Department. (PSR ¶ 89-10). Next, he worked his way up from that of a firefighter to a battalion chief and, eventually, to an Assistant Chief of the FDNY—occupying the second-highest rank among the uniformed members of the FDNY. (PSR ¶ 15).

The implicit trust that the FDNY placed in Saccavino by promoting him demonstrates a plain truth: the FDNY, and the public at-large, deserved more from a man of Saccavino's great potential. Saccavino may be a first-time offender, but the Guidelines take that into account when calibrating the level of punishment for first-time offenders. And while it may be true, as the Probation Office states, that Saccavino's record likely includes "thousands of good deeds and acts" (PSR p. 40), it was "precisely the defendant's mantle of integrity and benevolence that serve[d] as cover for an invidious end," *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009). Put differently, the success Saccavino enjoyed for the bulk of his career is what facilitated his ability to commit the instant crime and damage so severely the public trust. In short, and especially in a case of public corruption such as this one, more than a history of otherwise law-abiding behavior and exceptional prior service as a firefighter is required to support a variance from the Guidelines range of the sort sought by Saccavino.

### C. The Need for Deterrence and To Promote Respect for the Law

The sentence imposed must further general deterrence and promote respect for the law.

Saccavino's own record demonstrates that despite his pride in serving the FDNY, he grew willing to sacrifice the integrity of that very institution for financial gain. Saccavino's former colleagues at the FDNY—and similarly situated public servants throughout City government—should know that corruption motivated by greed and lies to law enforcement will not be ignored. The FDNY itself has more than 15,000 rank and file uniformed and civilian members, and at all relevant times had no more than 15 assistant chiefs (*i.e.*, the rank that Saccavino enjoyed). The unit Saccavino led, the BFP, at all relevant times had more than 500 members. The sentence imposed must send a clear message to the firefighters that Saccavino commanded and supervised that betraying the public trust will be met with stern consequences.

In a similar vein, promoting respect for the law requires that the public understands that individuals of Saccavino's stature will be held (at a minimum) to the same standard as the public they serve. Any sentence imposed should ensure public confidence that FDNY members charged with administering the City's fire safety code do so with integrity and impartiality.

### D. Relative Culpability

The Government views Saccavino as the most culpable member of the conspiracy, and he should be sentenced accordingly. Saccavino served as the conspiracy's leader. Shortly after arriving at the BFP, Saccavino recruited Santiago to be the face of his "business" in a manner that allowed Saccavino to use his behind-the-scenes influence to confer benefits in a pay-to-play scheme. Saccavino was the scheme's longest-running member. And because Saccavino outranked Cordasco, Saccavino had the stature and ability to stop the scheme in its tracks at any point. He did not do so. Saccavino's relative culpability demands he receive the highest sentence in this case. With the Court having imposed a sentence of 20 months' incarceration upon Cordasco, the Government respectfully submits that a custodial sentence of at least 30 months is sufficient but not greater than necessary in this case.

### E. Saccavino's Requested Variance Lacks Support

Saccavino suggests that the hardship a custodial sentence will impose on his family and himself warrants a non-custodial sentence. (Def. Mem. 1, 3). It does not. While the Government is certainly sympathetic to the effects that a prison sentence will have on Saccavino and his family, his conviction—and its consequences—is the unfortunate but highly foreseeable ramification of Saccavino's choices and is not a unique mitigating factor. Indeed, "[h]ardship on the family almost always results from serious criminal conduct." *United States v. Jiminez*, No. 10 Cr. 392 (CS), 2023 WL 3260395, at *1 (S.D.N.Y. May 4, 2023) (denying motion for compassionate release); *see also United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."). Accordingly, although the Government recognizes that the defendant's family circumstances are something the Court can consider at sentencing, they do not justify a variance resulting in a non-incarceratory sentence.

Further, although it is wholly appropriate for the Court to consider Saccavino's medical conditions when imposing sentence, 18 U.S.C. § 3553(a)(2)(D), it does not justify the extraordinary leniency Saccavino seeks. Indeed, the existence of those conditions did not prevent Saccavino from committing a sustained and serious bribery scheme or from prospering economically from that scheme. And as the Court is aware, the Bureau of Prisons is capable of addressing medical conditions, including, if need be, in a Federal Medical Center.

### F. The Court Should Impose a Substantial Fine Within the Applicable Guidelines Range

Finally, the Court should impose a substantial fine within the applicable Guidelines range of $30,000 to $250,000. As reported in the Presentence Report, the defendant has a net worth in excess of $3.5 million. (PSR ¶ 91). Section 5E1.2(a) of the Sentencing Guidelines "requires a district court to 'impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.'" *United States v. Glick*, 142 F.3d 520, 528 (2d Cir. 1998) (citation omitted). In assessing an appropriate fine, the sentencing court must consider certain factors, such as the defendant's income, earning capacity, and financial resources. *Id.* These factors are relevant "only to the amount of the fine, rather than the decision whether to impose a fine." *United States v. Corace*, 146 F.3d 51, 56 (2d Cir. 1998). Accordingly, a substantial fine within the applicable Guidelines range is reasonable and appropriate.

## IV. Conclusion

For these reasons, the Government respectfully submits that a sentence of incarceration of at least 30 months' imprisonment and a substantial fine within the Guidelines range of $30,000 to $250,000 is warranted.[2]

---

[2] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).

Respectfully submitted,

JAY CLAYTON
United States Attorney for
the Southern District of New York

By:     /s/
    Jessica Greenwood
    Matthew King
    Daniel H. Wolf
    Assistant United States Attorneys
    (212) 637-1090 / 2384 / 2337

cc: Counsel of Record (via ECF)